UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

HASSAN MUHAMMAD,

       Plaintiff,

    -against-

CITY OF NEW YORK; Detective JOSE
CHEVERE, Shield No. 1505; Sergeant TIMOTHY
JAYCOX, Shield No. 4836; Detective JESUS
RODRIGUEZ, Shield No. 4220; Detective
ANTONIO ESPARRA, Shield No. 5963; Detective
FRANK MONGE, Shield No. 4670; Sergeant
MICHAEL LOPUZZO, Shield No. 3261; Sergeant
HECTOR FUENTES, Shield No. 02736; Detective
BART SNYDER, Shield No. 4532; Correction
Officer MILLER, Shield No. 8660; Captain
BRAMWELL, Shield No. 360; and JOHN and
JANE DOE 1 through 10,

       Defendants.

---------------------------------------------------------------- x

**SECOND AMENDED
COMPLAINT**

Jury Trial Demanded

17 CV 625 (AJN) (KNF)

## NATURE OF THE ACTION

1.  This is an action to recover money damages arising out of the violation of

plaintiff's rights under the Constitution.

## JURISDICTION AND VENUE

2.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the

Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United

States.

3.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343 and 1367(a).

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

<u>JURY DEMAND</u>

5.     Plaintiff demands a trial by jury in this action.

<u>PARTIES</u>

6.     Plaintiff Hassan Muhammad is a resident of Bronx County in the City and State of New York.

7.     Defendant City of New York is a municipal corporation organized under the laws of the State of New York. It operates the NYPD, a department or agency of defendant City of New York responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including the individually named defendants herein.

8.     Defendants Detective Jose Chevere, Shield No. 1505; Sergeant Timothy Jaycox, Shield No. 4836; Detective Jesus Rodriguez, Shield No. 4220; Detective Antonio Esparra, Shield No. 5963; Detective Frank Monge, Shield No. 4670; Sergeant Michael LoPuzzo, Shield No. 3261; Sergeant Hector Fuentes, Shield No. 02736; Detective Bart Snyder, Shield No. 4532; Correction Officer Miller, Shield No. 8660; and Captain Bramwell, Shield No. 360 at all times relevant herein, were officers,

employees and agents of the NYPD and/or Department of Correction. The individual defendants are sued in their individual and official capacities.

9.     At all times relevant defendants John and Jane Doe 1 through 10 were police officers, detectives or supervisors employed by the NYPD and/or Department of Correction. Plaintiff does not know the real names and shield numbers of defendants John and Jane Doe 1 through 10.

10.    At all times relevant herein, defendants John and Jane Doe 1 through 10 were acting as agents, servants and employees of the City of New York and the NYPD and/or Department of Correction. Defendants John and Jane Doe 1 through 10 are sued in their individual and official capacities.

11.    At all times relevant herein, all individual defendants were acting under color of state law.

<u>CORRUPTION AND PERJURY AT THE 40th PRECINCT</u>

12.    The NYPD's 40th Precinct has an alarming recent history.

13.    In May 2006, Bronx County Supreme Court Justice Thomas Farber set aside a criminal conviction based on evidence that 40th Precinct detectives had used unconstitutional identification procedures:

> [T]he victim was brutally struck from behind…. One of the
> wounds was to the back of the skull, piercing the victim's
> occipital bone. The victim lost consciousness soon after he

> was stabbed. Thus any opportunity [for the victim] to view his attacker would be brief and not under optimal conditions. Less than a month later, while [the victim] lay in the hospital, tracheal tube in his throat, lapsing in and out of consciousness, he was shown a photographic array by [an officer of the 40th Precinct] and picked defendant out of the array. During this same time period, there is an indication in the hospital records that the defendant was sometimes unable to recognize his own brother. No subsequent line-up was held. The possibility that this identification was unnecessarily suggestive should have occurred to any reasonable defense counsel.

*People v. Rivera*, 12 Misc. 3d 1158(A), 819 N.Y.S.2d 212 (Sup. Ct. 2006).

14.    In January 2007, 40th Precinct Sergeant Timothy Jaycox, a defendant in this case, went to a citizen's home to question him about a shooting, even though the citizen was not a suspect in the crime and Jaycox was not handling the investigation. *People v. M.R.*, 26 Misc. 3d 1213(A), 907 N.Y.S.2d 102 (Sup. Ct. 2009).

15.    Evidence allegedly recovered by Jaycox inside the man's apartment was suppressed. *Id.* The reviewing court specifically questioned defendant Jaycox's truthfulness on the stand. *Id.* ("The Court has serious reservations about Sergeant Jaycox's credibility, particularly as to his reasons for going over to defendant's home when he was not assigned to the investigation of the shootings of defendant's brothers.").

16.    In 2008, NYPD's Internal Affairs Bureau ("IAB") began investigating veteran 40th Precinct Police Officer Jose Ramos. *See* Gregorian, Dareh, N.Y. DAILY

News, *Ex-NYPD Officer Gets Up To 23 1/2 Years for Ticket Fixing, Selling Fake DVDs, Plotting to Kill Witness, More*, Jan. 13, 2015 (accessible at http://nydn.us/2yOIj0J).

17.     Officer Ramos was suspected of secretly running two barbershops in the Bronx where his best friend, a convicted felon, was selling pounds of marijuana while using Officer Ramos's NYPD parking placard. *Id.*

18.     Ramos was convicted of attempted robbery and drug charges and later pled guilty to additional felony charges, including, *inter alia*, exposing a confidential informant and attempting to hire a hitman to murder a witness. *Id.*

19.     The ensuing IAB investigation led to the indictment of 15 police officers and the discipline of hundreds of others for ticket-fixing and other corrupt acts. *Id.*

20.     As part of the widening corruption probe, 40th Precinct Police Officers Virgilio Bencosme and Luis R. Rodriguez were arrested in 2011, along with Sergeant Jacob G. Solorzano. *See* Rashbaum, William K. and Baker, Al, N.Y. Times, *Authorities Move to Charge 16 Officers After Widespread Ticket-Fixing*, Oct. 27, 2011 (accessible at https://nyti.ms/2hq9vve).

21.     In a separate incident, 40th Precinct Police Officer Peter Hans admitted on cross examination at a trial that he had committed perjury and lied in a sworn affidavit, but was never criminally charged. *See* Deutsch, Kevin, N.Y. Daily News, *Cop*

*Not Charged After Admitting Perjury, Ticket Fixing Scandal While Testifying in Gun Case*, Sept. 17, 2011 (accessible at http://nydn.us/2zwv3gq).

22.     On February 15, 2013, uniformed 40th Precinct NYPD Officer Asar Sanad falsely swore in a criminal complaint, under penalty of perjury, that she had personally observed criminal conduct. *People v. Sanad*, 47 Misc. 3d 783, 785, 1 N.Y.S.3d 887, 889 (N.Y. Crim. Ct. 2015).

23.     When the false statements came to light, Officer Sanad was arrested and prosecuted on perjury charges. *Id.*

24.     On July 17, 2015, less than two months before plaintiff's arrest in this case, nineteen 40th Precinct officers were charged with purposefully misrepresenting crime data in official reports. Baker, Al, N.Y. TIMES, *19 Police Officers in the Bronx Are Charged with Downgrading Crimes*, July 17, 2015 (accessible at https://nyti.ms/2jZbEOK).

25.     Among the 40th Precinct officers accused of purposefully falsifying information on reported crimes were a lieutenant, eight sergeants, nine police officers and a detective. *Id.*

26.     The investigation resulted in the reassignment of 40th Precinct commanding officer Deputy Inspector Lorenzo Johnson. *Id.*

27.     Speaking of the misconduct at the 40th Precinct, NYPD chief spokesperson Deputy Commissioner Stephen P. Davis admitted: "It's disturbing, the scope of this." *Id.*

28.     On April 1, 2016, defendant Sergeant Michael LoPuzzo – the 40th Precinct's detective squad commander – conducted an illegal "two-step interrogation" of a criminal suspect inside the 40th Precinct interrogation room. *See United States v. Pritchette*, 219 F. Supp. 3d 379, 383-84 (S.D.N.Y. 2016) ("Law enforcement may not circumvent *Miranda* by engaging in a two-step interrogation process whereby a person is questioned without the proper warnings, made to confess, *Mirandized*, and then questioned again…The facts presented here indicate the use of an impermissible, two-step interrogation process.").

29.     LoPuzzo then lied to the Hon. William H. Pauley III about the circumstances of the interrogation while under oath at a suppression hearing in the Southern District of New York. *Id.* at 385.

30.     Even though defendant LoPuzzo's testimony was directly contradicted by clear video evidence, he refused to tell the truth. *Id.* ("Rather than acknowledge the obvious, LoPuzzo held firm in his denial that the hat was already on the interrogation room floor when he entered with Pritchette. This Court cannot credit such testimony."); *compare* Hearing Transcript at pp. 16, 21, 30, 34-35 (accessible at

http://bit.ly/2yqxZYh) *with* Pritchette Interrogation Video at 18:28:13 (accessible at https://vimeo.com/242248872/9b2dbc6515) *and* Audit Report (accessible at http://bit.ly/2i084ka).

31.     In an unrelated civil action also in this district, defendant LoPuzzo and 40th Precinct detectives are accused of wrongfully charging Bronx citizen Jarrett Frost with murder, despite video surveillance showing him in different clothing from the perpetrator, echoing the facts of this case. *See* 15 CV 4843 (NRB), First Amended Complaint, ¶¶ 17-36, 95-97 (accessible at http://bit.ly/2hoZr5w). Before he was acquitted at trial, Mr. Frost was incarcerated for over three and a half years. *Id.*

32.     In a December 2016 exposé on the 40th Precinct, The New York Times catalogued its scandals and deficiencies, with particular focus on the detective squad under defendant LoPuzzo. *See* Mueller, Benjamin and Baker, Al, N.Y. TIMES, *Rift Between Officers and Residents as Killings Persist in South Bronx*, Dec. 31, 2016 (accessible at https://nyti.ms/2jVye66).

33.     The article describes LoPuzzo's detectives as having the highest caseloads in the City and aggressively seeking to close cases under heavy pressure. *Id.*

34.     Detectives in LoPuzzo's squad have, on average, four days to close a shooting case, while detectives in other precincts have closer to a month. *Id.*

35.     The Times story notes that the 40th Precinct had the second-highest rate

of civilian complaints of any NYPD precinct and the most lawsuits alleging police misconduct.[1] *Id.*

36.    Earlier this year, in the wake of the Times' reporting, members of the New York City Council and the City's Public Advocate called on the municipality to address systemic issues at the 40th Precinct detective squad. *See* Mueller, Benjamin and Baker, Al, N.Y. TIMES, *New York Police Urged to Fix Inequities in Deployment of Investigators*, Jan. 4, 2017 (accessible at https://nyti.ms/2kOxSCo); *see also* Letter from Public Advocate Letitia James to Police Commissioner James P. O'Neill (accessible at http://bit.ly/2AzVBez).

37.    No meaningful reforms have taken place, however, and the conditions for systemic corruption and policy perjury persist.

## THE 40th PRECINCT FRAMES HASSAN MUHAMMAD

38.    At approximately 6:40 p.m. on September 12, 2015, an individual was shot in the doorway of a barbershop at 543 East 137th Street in the Bronx. *See* Miles,

---

[1] The 40th Precinct is also notorious for its unconstitutional stop and frisk policing tactics. During trial in the *Floyd* class action, recordings were played of 40th Precinct commanding officer Deputy Inspector Christopher McCormack directing officers to stop and summons "the right people," specifically referring to "male blacks 14 to 20, 21." *See* Goldstein, Joseph, N.Y. TIMES, *Recording Points to Race Factor in Stops by New York Police*, March 21, 2013 ("Officer Serrano…testified [at the *Floyd* trial]…that he believed his supervisors [at the 40th Precinct]…pressure[d] officers to stop blacks and Hispanics without reasonable suspicion."); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 599 & n.252 (S.D.N.Y. 2013).

Darla, EYEWITNESS NEWS, *Police: Man Shot in Stomach at Bronx Barbershop's Weekend Grand Opening*, Sept. 13, 2015 (accessible at http://7ny.tv/1OnIvU0).

39.     The shooter was wearing white sneakers. *See* Screen Shot (accessible at http://bit.ly/2hrlXel); Citywide Hospital Canvass Request (accessible at http://bit.ly/2zEKqkS).

40.     The investigation was assigned to defendant 40th Precinct Detective Jose Chevere, under the supervision of defendant LoPuzzo as squad commander.

41.     At the time of the shooting Mr. Muhammad was a block away - inside his home at 164 St. Ann's Avenue, with friends. *See* Recommendation for Dismissal, p. 2 (accessible at http://bit.ly/2iSAwUH).

42.     Mr. Muhammad's apartment building was equipped with video surveillance cameras positioned to capture all points of entry and exit, along with both elevator cars.

43.     Video footage from that day reflects that Mr. Muhammad and his friends did not leave the apartment building until 7:15 p.m. on September 12th, approximately 35 minutes *after* the shooting.

44.     Mr. Muhammad was wearing black sneakers. *See* Screen Shot (accessible at http://bit.ly/2zMylwW).

45.     When plaintiff walked past Chevere and defendant Antonio Esparra, the

detectives stopped and questioned him.

46.     Plaintiff explained that had been at home all day and that video from his building would immediately verify that fact.

47.     Mr. Muhammad was then released.

48.     No DD5 was ever prepared to document the questioning of Mr. Muhammad on September 12th.

49.     Over the next 72 hours, 40th Precinct detectives and their supervisors would ignore proof of plaintiff's innocence while at the same time fabricating evidence against him.

50.     Investigators obtained video footage from Mr. Muhammad's building that proved he was wearing different clothing from the shooter and that he was inside his building when the shooting occurred.

51.     No DD5 was prepared to document the proof offered by the video.

52.     Investigators at the 40th Precinct received at least three credible leads regarding the true perpetrator of the September 12th shooting.

53.     No DD5s were prepared to document the leads, or any investigation related to them.

54.     When defendant Chevere prepared the complaint report to document the shooting, he described the perpetrator as wearing black sneakers, even though video

made clear that the shooter's sneakers were white, in an effort to create false evidence linking Mr. Muhammad to the crime.

55.     The shooting victim told investigators and prosecutors that he knew Mr. Muhammad from the neighborhood and that he was not the shooter. *See* Recommendation for Dismissal, p. 2 (accessible at http://bit.ly/2iSAwUH).

56.     Two days later, on September 14, 2015, defendant Chevere arranged for the eyewitness to meet him at a McDonald's. *See* Eyewitness Statement (accessible at http://bit.ly/2Azxyg3).

57.     Chevere presented the eyewitness with a photo array and insisted the eyewitness choose Mr. Muhammad, even though the eyewitness was adamant that another individual in the photo array was the perpetrator. *See* Recommendation for Dismissal, pp. 2-3 (accessible at http://bit.ly/2iSAwUH); Eyewitness Statement (accessible at http://bit.ly/2Azxyg3).

58.     In official police paperwork, defendant Chevere provided a false account of the photo array identification, stating that the eyewitness had pointed to Mr. Muhammad and exclaimed "Oh my fucking god, that's him." *See* Photo Array Viewing Report (accessible at http://bit.ly/2zO1hV5).

59.     Using the fabricated identification evidence, 40th Precinct investigators then obtained a warrant for Mr. Muhammad's arrest.

60.     On September 15, 2015, 40th Precinct investigators arrested Mr. Muhammad on attempted murder and other felony charges in connection with the September 12th shooting.

61.     Mr. Muhammad was taken to the 40th Precinct and interrogated by defendant Chevere, under the supervision of defendants LoPuzzo and Fuentes. *See* Interrogation Video (accessible at https://vimeo.com/242245534/12264e0e7f).

62.     Plaintiff truthfully explained that he had been inside his apartment at the time and wearing different clothing than the perpetrator, and that his innocence could be definitively established by reviewing the surveillance footage. *Id.*

63.     Defendant Chevere admitted that he had reviewed the video, but told Mr. Muhammad that he would still "go down" for the attempted murder if he did not falsely confess. Mr. Muhammad declined. *Id.*

64.     Knowing Mr. Muhammad was innocent, defendants Chevere, LoPuzzo, Esparra, Monge and other unidentified defendants nevertheless arranged for him to be placed in a sham lineup, the existence of which was withheld from his counsel. *See* Lineup Information Report (accessible at http://bit.ly/2yxKG3G); Lineup Defense Counsel Report (accessible at http://bit.ly/2hxn24j).

65.     In the lineup, Mr. Muhammad was the only young man amongst a group of older police officers. *See* DD5 (accessible at http://bit.ly/2hnIhSh) (referring to fillers

as "MOS").

66.    The identification procedures were unconstitutional and violated Mr. Muhammad's due process rights.

67.    Defendants Rodriguez and Chevere brought the eyewitness to the lineup and, along with LoPuzzo, told the eyewitness: "[T]his is the easy part, just pick out the guy you picked in the photos yesterday." Eyewitness Statement, p. 2 (accessible at http://bit.ly/2Azxyg3).

68.    According to a sworn statement by the eyewitness, referring to the lineup:

> I believe I picked the person that was suggested to me the day before in the pictures. When I left the police I was sick to my stomach. I knew the guy I picked wasn't the guy that shot Manny. I left several messages for the district attorney telling her I wasn't coming in, the guy I picked was not the real shooter. *Id.*

69.    The officers laughed as Mr. Muhammad was taken for booking.

70.    At his subsequent arraignment, bail was imposed and Mr. Muhammad was remanded into the custody of the New York City Department of Correction.

71.    Mr. Muhammad would ultimately spend 219 days – over seven months – jailed on Rikers Island.

72.    Mr. Muhammad's experiences on Rikers were horrific, and included an excessive force incident on November 14, 2015 in which he was sprayed with a powerful chemical agent known as MK-9. *See* Injury to Inmate Report (accessible at

http://bit.ly/2mlVNeB).

73.    While Mr. Muhammad was incarcerated, his father suffered a stroke.

74.    Upon information and belief, the defendant police officers withheld the video footage and other exculpatory evidence from prosecutors and the grand jury and offered false testimony to the grand jury, resulting in plaintiff's indictment.

75.    On or about July 20, 2016, after becoming aware that the sole eyewitness alleged egregious police misconduct, prosecutors prepared and filed a detailed Recommendation for Dismissal. *See* Recommendation for Dismissal, pp. 2-3 (accessible at http://bit.ly/2iSAwUH).

76.    At his next scheduled Court appearance on or about July 26, 2016, the charges against Mr. Muhammad were dismissed in their entirety.

77.    Within ninety days after the claim alleged in this Complaint arose, a written notice of claim was served upon defendants at the Comptroller's Office.

78.    At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

79.    This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

80.     Mr. Muhammad suffered damage as a result of defendants' actions. Plaintiff was deprived of his liberty, suffered emotional distress, mental anguish, fear, pain, bodily injury, anxiety, embarrassment, humiliation, and damage to his reputation.

## FIRST CLAIM
### False Arrest

81.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

82.     Defendants violated the Fourth and Fourteenth Amendments because they arrested plaintiff without probable cause.

83.      As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## SECOND CLAIM
### State Law False Imprisonment and False Arrest

84.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

85.     By their conduct, as described herein, the individual defendants are liable to plaintiff for falsely imprisoning and falsely arresting plaintiff.

86.     Plaintiff was conscious of his confinement.

87.     Plaintiff did not consent to his confinement.

88.     Plaintiff's confinement was not otherwise privileged.

89.     Defendant City of New York, as an employer of the individual defendant officers, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

90.     As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

**THIRD CLAIM**
**Malicious Prosecution**

91.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

92.     By their conduct, as described herein, and acting under color of state law, defendants are liable to plaintiff under 42 U.S.C. § 1983 for the violation of his constitutional right to be free from malicious prosecution under the Fourth and Fourteenth Amendments to the United States Constitution.

93.     Defendants' unlawful actions were done willfully, knowingly, with malice and with the specific intent to deprive plaintiff of his constitutional rights. The prosecution by defendants of plaintiff constituted malicious prosecution in that there was no basis for the plaintiff's arrest, yet defendants continued with the prosecution, which was resolved in plaintiff's favor.

94.     As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

_____

## FOURTH CLAIM
### State Law Malicious Prosecution

95.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

96.     By their conduct, as described herein, defendants are liable to plaintiff for having committed malicious prosecution under the laws of the State of New York.

97.     Defendants maliciously commenced criminal proceeding against plaintiff, charging him with resisting arrest, menacing and disorderly conduct. Defendants falsely and without probable cause charged plaintiff with violations of the laws of the State of New York.

98.     The commencement and continuation of the criminal proceedings against plaintiff was malicious and without probable cause.

99.     All charges were terminated in plaintiff's favor.

100.    Defendants, their officers, agents, servants and employees were responsible for the malicious prosecution of plaintiff. Defendant City of New York, as an employer of the individual defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

101.    As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

### FIFTH CLAIM
### Deprivation of Federal and State Due Process

102.  Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

103.  The defendants used unduly suggestive pretrial procedures against Mr. Muhammad.

104.  In using unduly suggestive pretrial procedures against Mr. Muhammad, the individual defendants violated plaintiff's Due Process rights as guaranteed by the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Article 1, Section 6 of the New York Constitution.

105.  As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages alleged herein.

### SIXTH CLAIM
### Denial of the Right to a Fair Trial

106.  Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

107.  The individual defendants withheld material exculpatory evidence from prosecutors, fabricated and altered evidence related to the crime and the alleged identification of Mr. Muhammad as a perpetrator, and forwarded false evidence to prosecutors in the Bronx County District Attorney's office.

108.   In creating false evidence against plaintiff, and in forwarding false information to prosecutors, the individual defendants violated plaintiff's right to a fair trial under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

109.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

<u>SEVENTH CLAIM</u>
### Negligence; Negligent Hiring/Training/Retention

110.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

111.   Defendant City, through the NYPD, owed a duty of care to plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to plaintiff or to those in a like situation would probably result from the foregoing conduct.

112.   Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

113.   Upon information and belief, defendant City knew or should have known through the exercise of reasonable diligence that the individual defendants were potentially dangerous.

114.   Upon information and belief, defendant City's negligence in screening, hiring, training, disciplining, and retaining these defendants proximately caused each of plaintiff's injuries.

115.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## EIGHTH CLAIM
### State Law Assault and Battery

116.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

117.   By their conduct, as described herein, the defendants are liable to plaintiff for having assaulted and battered him.

118.   Defendant City of New York, as an employer of the individual defendant officers, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

119.   As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

## NINTH CLAIM
### Excessive Force

120.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

121.   By their conduct, as described herein, the defendants are liable to plaintiff for using excessive force against him on Rikers Island on or about November 14, 2015.

122.   As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

## TENTH CLAIM
### Intentional Infliction of Emotional Distress

123.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

124.   By reason of the foregoing, the defendants, acting in their capacities as NYPD officers, and within the scope of their employment, each committed conduct so extreme and outrageous as to constitute the intentional infliction of emotional distress upon plaintiff.

125.   The intentional infliction of emotional distress by these defendants was unnecessary and unwarranted in the performance of their duties as NYPD officers.

126.   Defendants, their officers, agents, servants, and employees were responsible for the intentional infliction of emotional distress upon plaintiff. Defendant City, as employer of each of the defendants, is responsible for their wrongdoings under the doctrine of *respondeat superior.*

127.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

_____

## ELEVENTH CLAIM
### Negligent Infliction of Emotional Distress

128.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

129.   By reason of the foregoing, defendants, acting in their capacities as NYPD officers, and within the scope of their employment, each were negligent in committing conduct that inflicted emotional distress upon plaintiff.

130.   The negligent infliction of emotional distress by these defendants was unnecessary and unwarranted in the performance of their duties as NYPD officers.

131.   Defendants, their officers, agents, servants, and employees were responsible for the negligent infliction of emotional distress upon plaintiff. Defendant City, as employer of each of the defendants, is responsible for their wrongdoings under the doctrine of *respondeat superior*.

132.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## TWELFTH CLAIM
### Failure to Intervene

133.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

134.    Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

135.    Accordingly, the defendants who failed to intervene violated the Fourth, Fifth, Sixth and Fourteenth Amendments.

### THIRTEENTH CLAIM
*Supervisory Liability*

136.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

137.    Defendants LoPuzzo, Fuentes and unidentified supervisors directly participated in the alleged constitutional deprivation.

138.    LoPuzzo, Fuentes and other 40th Precinct supervisors created a policy or custom under which perjury and suggestive identification procedures occurred.

139.    LoPuzzo, Fuentes and other 40th Precinct supervisors were negligent, reckless and deliberately indifferent in supervising their subordinates.

140.    As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## FOURTEENTH CLAIM
### *Monell*

141.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

142.    The City of New York is responsible for the constitutional harm suffered by Mr. Muhammad in two ways.

143.    First, faced with a widespread pattern of misconduct at the 40th Precinct it has done nothing, compelling the conclusion that it has tacitly authorized suggestive identification procedures, the filing of false reports and perjury.

144.    Second, the City has failed to train and adequately supervise the detective squad at the 40th Precinct, with deliberate indifference to citizens like Mr. Muhammad.

145.    Citywide failures to adequately address police perjury issues have been well documented. *See, e.g., Cordero v. City of New York*, --- F.Supp.3d ----, 2017 WL 4685544 (E.D.N.Y. Oct. 17, 2017) (Weinstein, J.).

146.    The Mayor's Commission to Combat Police Corruption ("CCPC"), established in 1995, is a successor to the Mollen Commission that provides non-binding civilian review of the NYPD. *See* http://www1.nyc.gov/site/ccpc/index.page. CCPC staff attend high level Internal Affairs Bureau ("IAB") meetings, review samples of open disciplinary cases and receive complete files on every closed complaint investigated by IAB. *Id.*

-25-

147.   In periodic public reports, the CCPC presents anonymized findings that detail, categorize and critique police misconduct investigative procedures and outcomes citywide. In its most recent 18th Report, published in August 2017 ("CCPC Report"), the Commission analyzed incidents of substantiated false police officer statements and identified deficiencies in NYPD's perjury-reduction scheme. *See* http://www1.nyc.gov/assets/ccpc/downloads/pdf/18th-Annual-Report.pdf, pp. 112-139, 171-173.

148.   Based on the CCPC Report and the NYPD Inspector General's April 2015 Report "Using Data from Lawsuits and Legal Claims Involving NYPD to Improve Policing," it is evident that § 1983 lawsuit outcomes and judicial determinations of officer incredibility are not sufficiently captured by NYPD, precluding any investigation. *See*, *e.g.*, Weiser, Benjamin, N.Y. TIMES, May 12, 2008, *Police in Gun Searches Face Disbelief in Court* ("With few exceptions, judges did not ask prosecutors to determine whether the officers [discredited at suppression hearings] had broken the law, and prosecutors did not notify police authorities about the judges' findings. The Police Department said it did not monitor the rulings….") (available at https://nyti.ms/2s0oNWY); NYPD Inspector General's April 2015 Report "Using Data from Lawsuits and Legal Claims Involving NYPD to Improve Policing," p. iii, available at http://tinyurl.com/NYPD-OIG-April-2015-Report ("…NYPD, the Comptroller's

Office, and the Law Department need to start tracking more details about the nature of the [lawsuits] and the core allegations, information about the subject police officer, the location of the alleged incident, and the address of the plaintiff.").

149.   IAB and the NYPD's Office of the Department Advocate ("DAO"), responsible for prosecuting most NYPD disciplinary cases, have deficient policies and practices for imposing punishment in credible perjury and overtime abuse cases – policies geared to minimize officer discipline and avoid terminations. *See* CCPC Report at pp. 113-139 (the below chart appears at p. 114).

| Officers Found Guilty of Misconduct Involving False Statements | Officers Found Guilty of False Statement Charges Under Patrol Guide § 203-08 [mandating termination] | Officers Found Guilty of False Statement Under Alternative Patrol Guide Sections [termination not automatic] |
|---|---|---|
| 161 | 20 (12.4 %) | 141 (87.6 %) |

150.   NYPD's Performance Analysis Section ("PAS"), which ostensibly monitors and identifies problem officers, fails to adequately incorporate available evidence of perjury and incredibility in its RAILS database and other tracking mechanisms, resulting in incomplete and ineffective targeting and monitoring.

151.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully requests judgment against defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and

(d) Such other and further relief as this Court deems just and proper.

Dated:      November 13, 2017
            New York, New York

HARVIS & FETT LLP

_____
Gabriel P. Harvis
305 Broadway, 14th Floor
New York, New York 10007
(212) 323-6880
gharvis@civilrights.nyc

*Attorneys for plaintiff*

-28-